U. S. DISTRICT COURT
Southern District of Ga.
Filed in Office

3|31|16

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

TYRONE T. MILLER and SHEILA )
MILLER, )
              )
    Plaintiffs, )
              )
v.            )     CASE NO. CV413-239
              )
NAVALMAR (UK) LTD. and GRIEG )
STAR SHIPPING II AS, )
              )
    Defendants. )

# O R D E R

Before the Court are Defendants Grieg Star Shipping AS's (Doc. 86) and Navalmar (UK) Ltd.'s (Doc. 89) Motions for Summary Judgment. For the following reasons, Defendants' motions are **GRANTED**. As a result, Plaintiffs' Motions to Exclude (Doc. 82; Doc. 84) are **DISMISSED AS MOOT**.[1] The Clerk of Court is **DIRECTED** to close this case.

## BACKGROUND

This case arises from an injury Plaintiff Tyrone T. Miller[2] sustained while employed as a longshoreman by SSA

---

[1] Because the Court has determined oral argument unnecessary in this case, Defendant Grieg's Motion for Oral Hearing (Doc. 110) is **DENIED**.
[2] Plaintiffs' third amended complaint includes a loss of consortium claim on behalf of Plaintiff Sheila Miller. (Doc. 46 ¶¶ 47-48.)

Stevedoring ("SSA").[3] (Doc. 101 at 8-9.) On September 28, 2011, Plaintiff[4] was selected to work the 6:00 p.m. shift aboard the M/V Carrara Castle ("Vessel"). (Id. at 1.) At the time, the vessel was owned by Defendant Navalmar and provided to Defendant Grieg under a written time charter.[5]

When Plaintiff arrived at the jobsite, SSA had already loaded a substantial portion of the hold with rolls of Kraft Liner Board ("KLB"). (Id. at 2.) The rolls were approximately eight feet in height and stacked end-on-end in four tiers, a technique commonly referred to as the chimed method. (Id.) The result was a number of thirty-two-foot high stacks of KLB rolls. (Id.) Because of the KLB rolls' curved edges, the chimed method results in smaller gaps between the rolls, and larger gaps between the rolls and the corner of the hold. (Id. at 3.)

---

[3] For the purposes of ruling on Defendants' Motions for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiffs. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 577-78 (1986).

[4] Because Plaintiff Sheila Miller's claims are entirely derivative of Plaintiff Tyrone Miller's, the Court will refer to Plaintiff Tyrone Miller as Plaintiff.

[5] A time charter agreement provides that the charterer will use a ship for a specific period of time for the purpose of shipping goods. Thomas J. Schoenbaum, 2 Admiralty & Maritime Law § 11-5 (5th ed. 2011). "In a time charter the vessel owner commonly retains possession and control of the vessel, provides the crew and fully equips and maintains the vessel." Id.

To prepare for the next commodity to be loaded in that hold, SSA directed Plaintiff to place sheets of plywood on top of the outermost rolls. (Id. at 8.) The plywood, approximately four feet across and eight feet long, would help cover the gaps between the rolls and the hold's bulkhead and would provide the support necessary for the palletized cargo to be placed on top of the rolls. (Id.) Plaintiff was tasked with covering the larger corner gaps with two sheets of plywood in an overlapping "L" shaped pattern. (Id.) "[I]n a momentary lapse of concentration," Plaintiff stepped onto the plywood he had placed over a corner gap. (Id. at 9.) Because of the minimal support provided by the rolls due to the large corner gap, the plywood collapsed and Plaintiff was injured after falling the thirty-two feet to the bottom of the hold. (Id.)

Plaintiff maintains that stowing KLB rolls in the chimed method routinely created the large corner gaps and that he assumed some sort of fall protection was present between the tiers, such as airbags, plywood, or nets. (Id. at 8-9.) Defendants contend the KLB rolls had to be stowed in the chimed fashion to prevent damage that could result in

3

the product failing to properly unroll when utilized by the end consumer. (Doc. 89, Attach. 1 at 2.) Additionally, Defendants claim that the use of plywood between individual tiers causes similar damage to the edges of the KLB rolls. (Id. at 5-6.) Defendant Grieg's Shipping Procedures did call for securing gaps in chimed rolls destined for certain ports "in a manner that prevents a man from falling into the void-- using airbags, webbing, netting, or any other manner as directed by the attending port captain." (Doc. 104, Attach. 1 at 2.) However, Defendants maintain that airbags and netting were unusable for the larger corner gaps. (Doc. 89, Attach. 1 at 5.) The corner gaps were too large for airbags, which are designed to secure cargo and not fall protection. (Id.) Netting and webbing were impractical solutions because they could not be secured to the smooth bulkhead, leaving it sagging into the larger corner gaps. (Id.)

Based on his fall, Plaintiff filed suit in the State Court of Chatham County. (Doc. 1, Ex. 1.) Defendants invoked this Court's diversity jurisdiction and timely removed the complaint to this Court pursuant to 28 U.S.C. § 1332. (Doc. 1.) In his third amended complaint, Plaintiff alleges that his injuries were caused, in part, by Defendants'

4

negligence. (Doc. 46 ¶ 36.) Plaintiff contends that Defendants provided a vessel with no attachments for netting, instituted procedures that did not permit the placement of plywood and airbags between tiers to arrest falls, and failed to intervene when the inadequate fall protection became apparent. (Id.)

In their Motions for Summary Judgment, Defendants maintain that they did not breach any duty owed to Plaintiff because they turned over a reasonably safe vessel, were not actively involved in loading the cargo, were not in active control of the hold at the time of the incident, and were not required to intervene in SSA's loading operation. (Doc. 87 at 15-23; Doc. 89, Attach. 1 at 13-25.) In response, Plaintiff argues that Defendants failed to turn over a reasonably safe vessel because the hold did not include equipment to which netting could be secured over the corner gaps as fall protection. (Doc. 101 at 13-16.) Additionally, Plaintiff argues that Defendant Grieg's Shipping Procedures constitute active involvement in the loading process. (Id. at 17-21.) Finally, Plaintiff reasons that Defendants had a duty to intervene in the loading process once it became apparent that loading the KLB rolls in the chimed method

would result in large, unsafe gaps in two corners. (<u>Id.</u> at 21-25.)

## ANALYSIS

I. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (<u>citing</u> Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is

essential. <u>DeLong Equip. Co. v. Wash. Mills Abrasive Co.</u>, 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex</u>, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. <u>Matsushita</u>, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u> at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. <u>See, e.g.</u>, <u>Tidwell v. Carter Prods.</u>, 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the

Court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989).

II. <u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

    A. <u>Liability Under The Longshore And Harbor Workers' Compensation Act</u>

Section 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950 authorizes suits by Longshoremen injured due to the negligence of a shipowner or charterer. The Supreme Court, however, has significantly narrowed the duties a shipowner or charterer owes to longshoremen under the LHWCA. First, "a shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety, and must warn the stevedore of any hidden dangers of which it knows or should know." <u>Roach v. M/V Aqua Grace</u>, 857 F.2d 1575, 1581 (11th Cir. 1988) (<u>citing</u> <u>Scindia Steam Navigation Co. v. De Los Santos</u>, 451 U.S. 156, 166-67 (1981)). Second, there is generally no duty to supervise the stevedore during cargo loading, " 'absent contract provisions, positive law, or custom to the contrary.' " <u>Id.</u> (<u>quoting</u> <u>Scindia</u>, 451 U.S. at 172). In this respect, the shipowner or charterer is permitted to "rely on the

8

stevedore to perform its work with reasonable care." Id. (citing Scindia, 451 U.S. at 172). Once cargo loading is underway, however, the shipowner or charterer may be liable if it "actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Scindia, 451 U.S. at 167. Lastly, the shipowner has a duty to intervene only when it becomes aware that the ship or its equipment poses a danger to the stevedore, and that the stevedore is acting unreasonably to protect the longshoremen. Roach, 857 F.2d at 1581 (citing Scindia, 451 U.S. at 178).

1. Turnover Duty

In their motions,[6] Defendants contend that they did not violate their duty to turnover a reasonably safe ship. (Doc.

---

[6] While the arguments raised in Defendants' two motions differ in their specifics, they are nearly identical in substance, as demonstrated by Plaintiff's almost identical responses to both. Based on the similarity and for ease of reference, the Court will not refer to each individual motion in its analysis. In addition, the Court assumes without deciding that Defendants Navalmar and Grieg owed the same duties to Plaintiff.

87 at 15-17.) In response, Plaintiff argues that Defendants breached their turnover duty "when the vessel was turned over to SSA to be loaded with KLB in a 'chimed' stow but without . . . places for attachment of safety nets in the corners of the hold." (Doc. 101 at 2.) With respect to the turnover duty, a shipowner is required to

> "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

In re Natures Way Marine, LLC, 2013 WL 6157928, at *6 (S.D. Ala. Nov. 25, 2013) (quoting Fed. Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S. 404, 416 n.18 (1969)).

In this case, there is no evidence in the record that Defendants breached the turnover duty. As noted above, Plaintiff must point to evidence establishing that an expert and experienced stevedore would not be able, by the exercise of reasonable case, to carry on its cargo operations with reasonable safety to persons and property. Id.; see also Bjaranson v. Botelho Shipping Corp., Manila, 873 F.2d 1204, 1208 (9th Cir. 1989). There is simply no evidence in the record that stowing KLB rolls in the chimed method without

10

any way to attach a safety net in the larger corner voids would preclude SSA from loading the vessel with reasonable safety. Plaintiff's supervisor in the hold, SSA's head stevedore overseeing the loading operations, and Plaintiff's expert witness all testified that there was nothing unusual or unsatisfactory about the hold on the date of the incident, including the absence of any place to attach netting over the larger corner gaps. (Doc. 72 18:24 to 19:2; Doc. 71 70:8-22; Doc. 70 102:12-15.) Plaintiff's expert did opine that he believed the charterer of a vessel has a duty to protect the corner gaps. (Doc. 70 103:2-9.) That opinion, however, falls far short of establishing that an expert and experienced stevedore, exercising reasonable care, would not be able to carry on its cargo operations with reasonable safety to persons and property. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's claim based on a breach of Defendants' turnover duties.

2. Active Involvement

Defendants maintain that they were not actively involved in the loading of cargo at the time of Plaintiff's injury. (Doc. 87 at 17-19.) In response, Plaintiff contends that Defendants were actively involved because Defendant Grieg had written procedures concerning the loading

operation, theoretically enforced by the presence of Defendant Grieg's Port Captain on the vessel during loading.[7] (Doc. 101 at 17-21.) A shipowner or time charterer may become liable for injuries where "it actively involves itself in the cargo operations and negligently injures a longshoreman." Scindia, 451 U.S. at 167.[8] Based on their liability for certain damage to cargo, however, a shipowner or charterer may have some degree of participation in cargo operations without becoming actively involved. For example, a shipowner or charterer dos not incur any liability for injuries to the longshoremen by observing cargo operations. Derr v. Kawasaki Kisen K.K., 825 F.2d 490, 494 (3rd Cir. 1987). Similarly, the creation of stowage plans or safety procedures is not the level of involvement required to render a shipowner or charterer actively involved in loading

---

[7] There is no evidence in the record that Defendant Grieg's Port Captain ever actually enforced any of the Shipping Procedures.
[8] A shipowner can also be liable where "it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Scindia, 451 U.S. at 167. The Court understands Plaintiffs' complaint to allege that Defendants were actively involved in loading the cargo through implementation of Defendant Grieg's Shipping Procedures, not that they were in active control of the cargo hold or any equipment.

the vessel. See Jones v. Sanko Steamship Co., ___ F. Supp. 3d ___, 2015 WL 8361745, at *13 (D.N.J. 2015); see also Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 103-104 (1994) (recognizing creation of stowage plan does not constitute active involvement); Price v. Atl. Ro-Ro Carriers, 45 F. Supp. 3d 494, 507-08 (D. Md. 2014) ("[E]ven where a vessel plans some limited aspect of a cargo operation—such as a stowage plan for storing cargo—involvement at that level may not constitute active control under Scindia.").

After reviewing Defendant Grieg's Shipping Procedures, the Court concludes that Defendants were not actively involved in the loading of cargo. The Shipping Procedures simply contained guidelines concerning the proper way to stow and secure certain types of cargo. After an exhaustive review, the Court can find no case concluding that the Shipping Procedures amount to active involvement in the loading process. In the absence of any contractual provision, positive law, or custom to the contrary, a shipowner simply "has no general duty by way of supervision or inspection to exercise reasonable care to discover

dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." Id. at 172. Because the evidence Plaintiff identifies fails to establish that Defendants were actively involved in the cargo operations, Defendants are entitled to summary judgment with respect to Plaintiff's claim based on Defendants' alleged active involvement.

### 3. Duty to Intervene

Defendants argue that they did not have a duty to intervene in the loading process because "nothing about the loading and stowage methods employed by the stevedores would have put [them] on notice of an unreasonable risk of harm." (Doc. 87 at 19.) In response, Plaintiff contends that Defendants "should have intervened as a result of the open corner void 32' deep, which could not be adequately rendered safe." (Doc. 101 at 21.) Also, Plaintiff claims that there is evidence in the record establishing SSA was "acting improvidently when it, among other things, violated [Occupational Safety and Hazard Administration] fall protection regulations through allowing the longshoremen to work within 3' of an unprotected edge 8' or higher." (Id.)

14

Once in control of a vessel, the stevedore bears the primary responsibility for the safety of the longshoremen. Lampkin v. Liberia Athene Transp. Co., 823 F.2d 1497, 1501 (11th Cir. 1987). However, an shipowner or charterer "has a duty to intervene to protect the longshoremen [] if 'it becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen.' " Id. (quoting Clark v. Bothelho Shipping Corp., 784 F.2d 1563, 1565 (11th Cir. 1986)). A duty to intervene only arises where a shipowner or charterer has actual knowledge of both the hazard, Lampkin, 823 F.2d at 1501, and that the stevedore is exercising "obviously improvident" judgment by continuing to work despite the hazard, Sobrino-Barrera v. Anderson Shipping Co., 2011 WL 5245396, at *7 (N.D. Tex. Oct. 24, 2011) (quoting Greenwood v. Societe Francaise De, 111 F.3d 1239, 1249 (5th Cir. 1997)).

Plaintiff's argument fails for two reasons. First, Plaintiff does not point to any evidence in the record establishing that Defendants knew of the allegedly dangerous condition. In this respect, Plaintiff appears to rely on the

notion that Defendant Grieg created the stowage plan, which required that the KLB rolls be loaded in the chimed method. Therefore, Defendants must have known that loading the rolls in that manner would create the dangerously large corner gap. This argument, at best, would establish that Defendants had constructive, not actual, knowledge of the danger. However, a duty to intervene only arises where an shipowner has actual knowledge of a hazard. Lampkin, 823 F.2d at 1501.

Second, even assuming Defendants had actual knowledge of the hazard, there is no evidence in the record that SSA's decision not to protect the corner gaps with a barricade was obviously improvident such that Defendants were required to intervene. Plaintiff fails to identify any action taken by SSA during the loading of the KLB rolls that would be considered abnormal. Also, there is no indication SSA, Plaintiff, or any other longshoreman complained about the alleged hazard, but rather they continued to load the vessel. See Harris v. Pac.-Gulf Marine, Inc., 967 F. Supp. 158, 165 (E.D. Va. 1997) (noting neither stevedore nor longshoreman complained of alleged hazard). Quite simply, this Court finds nothing with respect to SSA's decisions

regarding loading the vessel that could be considered so egregious such that Defendants had a duty to intervene. See Burns v. D. Oltmann Mar. PTE Ltd., 901 F. Supp. 203, 208 (E.D. Va. 1995) (finding that "only the most eggregious [sic] decisions by the stevedore are 'obviously improvident' "). Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's claim based on a breach of the duty to intervene.[9]

### CONCLUSION

For the foregoing reasons, Defendants Grieg Star Shipping AS's (Doc. 86) and Navalmar (UK) Ltd.'s (Doc. 89) Motions for Summary Judgment are **GRANTED**. As a result, Plaintiffs' Motion to Exclude (Doc. 82; Doc. 84) are **DISMISSED AS MOOT**. The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this 31ST day of March 2016.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[9] Because Defendants have been awarded summary judgment with respect to all of Plaintiff Tyrone Miller's claims, Plaintiff Sheila Miller's derivative loss of consortium claim must fail.

17